IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) ) ) No. 18 CR 815-1 ) ) Judge Virginia M. Kendall ) ) ) |
| v. | |
| EMANUEL DAMERON | |

**MEMORANDUM OPINION AND ORDER**

Defendant Emanuel Dameron is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Dkt. 1 at 1). This charge resulted from an encounter with Chicago Police Department ("CPD") Officers on July 5, 2018. (Dkt. 71 at 1). An officer observed Dameron through a POD camera and then sent the information to other officers who approached him on a city bus and seized a firearm and plastic wrapped packets of marijuana. Dameron admitted that he did not have a conceal and carry permit. He was placed under arrest. Dameron moved to suppress his arrest, his statement to the police, and his handgun and ammunition, claiming the officers lacked reasonable suspicion to detain or search him and lacked probable cause as a result. (*Id.* at 6; Dkt. 73 at 1). On July 29, 2021, the Court held an evidentiary hearing. (Dkt. 87). The United States presented the testimony of CPD Officers Jeremy Nash and Malcolm Brogsdale, as well as camera footage of the events in question. After reviewing the testimony and evidence presented at the hearing, the Court denies Dameron's motion to suppress [71].

**BACKGROUND**

Officer Jeremy Nash testified at the hearing. Jeremy Nash is a 6-year veteran of the Chicago Police Department. (Hearing Tr. at 8:6–7). On July 5, 2018, he was assigned to the 3rd District Strategic Decision Support Center where he monitored the City's POD camera system and

1

Shot Spotter system. (*Id.* at 8:16–22). At approximately 5:09 pm, Nash observed Dameron walking on the 6100 block of South Martin Luther King Drive via footage from the POD camera.[1] Nash is able to zoom in on individuals that he is observing live on the POD camera and he is also able to move the camera right and left to follow individuals. (*Id.* at 9:4–5). Nash was monitoring 61st and King Drive because there is a lot of gang activity there. (*Id.* at 10:6–9). In fact, Nash has monitored that area almost every day for the 18 months that he has been assigned to the 3rd District Strategic decision Support Center. (*Id.* at 15:9–20). In the 18 months that he has worked that position, Nash has seen shootings and narcotics trafficking at that location repeatedly. (*Id.* at 10:8–9).

On that day, Nash observed Dameron and noticed what he believed to be a firearm in his shirt. (*Id.* at 11:3–6). Nash saw what looked like a heavy L-shaped object in Dameron's shirt. (*Id.*; *id.* at 14:5–7). Nash has observed this same shaped object "multiple times" and based on his experience he determined it was a firearm. (*Id.* at 14:8–11). Nash zoomed in on the object to be certain and then flagged that portion of the video to save it for future use. (*Id.* at 11:12–14). Upon observing what he believed to be a gun in Dameron's shirt, Nash notified the tactical officers and conveyed this information to them. (*Id.* at 14:12–14). As the officers suited up to go on the street, Nash observed Dameron board a CTA bus and therefore notified the officers of what he observed. (*Id.* at 14:20–23).

Officer Malcolm Brogsdale testified at the hearing. Officer Brogsdale is an 8-year veteran of the Chicago Police Department. (*Id.* at 22:17–19). Brogsdale testified that Nash informed him

---

[1] Per the Government, a POD is a remote "video surveillance camera" that "is capable of sending real-time images and can record from a distance criminal activity committed on the public way;" "is remotely controlled and has pan/tilt/zoom and night-vision capabilities;" and is "affixed to a street pole or other fixed object in designated areas." (Dkt. 73). *See also, e.g., United States v. Watson*, No. 17-cr-381-2, 2018 WL 4181505, at *1 n.1 (N.D. Ill. Aug. 31, 2018) ("A POD camera is a video surveillance camera issued by the [CPD] that is usually placed in high-crime areas.").

that he observed a male with what he believed to be a gun in his shirt and he gave him the description, the location, and also the information that he had just boarded a bus. (*Id.* at 23:20 – 24; *id.* at 26:19–21). Brogsdale is also familiar with the area of 61st and King because there is on-going gang conflict there between the Front Street Brick City Black Disciples and the Gangster Disciples Jaro City factions. (*Id.* at 24:10–25). Brogsdale knows that several people are shot and killed in that area every year. (*Id.* at 25:4–7). In fact, Brogsdale has been called to that spot to react to criminal activity close to one hundred times. (*Id.* at 26:14–17).

Brogsdale received the information from Nash and the description of Dameron and immediately went to the CTA bus, pulled it over, entered and did a pat down of Dameron on the bus. (*Id.* at 26:23–27:12). Brogsdale retrieved a weapon with a defaced serial number and one bullet in the chamber. (*Id.* at 27:15–22). Brogsdale removed Dameron from the bus and asked him if he had a conceal and carry permit and Dameron stated that he did not. (*Id.* at 32:2–6). Brogsdale also retrieved packets of marijuana that were on Dameron's person and asked him what he had been doing; Dameron admitted that he had been "selling weed." (*Id.* at 32:10–17; *id.* at 33:13–16). When he was asked about the gun, Dameron admitted that he had the gun for protection because a lot of people are getting killed over there. (*Id.* at 33:13–16).

The officers vest video cameras show that the tactical officers traveled to Dameron's location, briefly curbed and boarded the bus at 6246 South King Drive, and Brogsdale "quickly patted down the front of Dameron's waist, felt the handle of a pistol, and quickly removed a black Beretta model 84F, 380 caliber, semi-automatic handgun from [Dameron's] T-shirt." (Dkt. 77 at 0:19–0:25). The firearm was loaded with a single bullet and had a magazine containing ammo attached to it. (*Id.* at 0:28–:32).

CPD Officers then escorted Dameron off the bus. (*Id.* at 0:29–:50). An officer asked Dameron if he possessed a concealed carry license ("CCL") or Firearm Owners Identification ("FOID") card. (*Id.* at 0:35–:43). Dameron answered no and was placed under arrest. (*Id.* at 0:43–45).

## **LEGAL STANDARD**

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. Amend. IV. Generally, searches and seizures are unreasonable unless conducted pursuant to a warrant issued by a neutral magistrate after finding probable cause. *See Illinois v. McArthur*, 531 U.S. 326, 330 (2001). However, law enforcement officers can conduct reasonable searches and seizures *absent* a warrant under certain recognized exceptions to the warrant requirement. *Id.* at 330–31. One exception to the warrant requirement "permits law enforcement to conduct a brief investigative stop[,]" or *Terry* stop, "when an officer reasonably suspects a person is engaged in criminal behavior." *United States v. Adair*, 925 F.3d 931, 935 (7th Cir. 2019) (citing *Terry v. Ohio*, 392 U.S. 21, 30 (1968). *See also United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011) (explaining the same where officers suspect the "stopped individual has or is about to commit a crime").

To determine whether reasonable suspicion existed for a *Terry* stop, courts consider the "totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) (internal quotations and citation omitted). *See also United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Jackson*, 300 F.3d 740, 745–46 (7th Cir. 2002). Officers must be aware of specific and articulable facts giving rise to reasonable suspicion, and the degree of intrusion resulting from the stop must be reasonably related to the known facts.

4

*Bullock*, 632 F.3d at 1012. "While inarticulate hunches are not enough, reasonable suspicion is a lower threshold than probable cause and considerably less than preponderance of the evidence[.]" *Adair*, 925 F.3d at 935 (internal quotations and citations omitted). *See also Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "Reasonable suspicion can arise from behavior that may in other circumstances be considered innocent; in other words, context matters." *Ruiz*, 785 at 1141 (internal quotations and citation omitted). *See also Arvizu*, 534 U.S. at 274–75.

When an officer has legitimately stopped an individual, the officer can frisk the individual so long as "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger." *Terry*, 392 U.S. at 27. "Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken." *Id.* at 31.

## **DISCUSSION**

The parties dispute whether the Officers' seizure and search of Dameron were supported by reasonable suspicion. To begin, it is well-established that law enforcement may (1) conduct an investigatory stop of a person suspected of possessing a firearm based on a bulge in a pocket or shirt that appears to be a firearm, and (2) rely on their training and experience in deducing whether the bulge may indicate a firearm. *See, e.g.*, *United States v. Wilson*, 963 F.3d 701, 703–04 (7th Cir. 2020) (finding of reasonable suspicion supported in part by "conspicuous bulge" in suspect's pocket and presence in high-crime area); *United States v. Adair*, 925 F.3d 931, 934 (7th Cir. 2019) (approving *Terry* stop where, among other things, there was a "conspicuous, large bulge in the front pocket of [defendant's] jeans"); *United States v. Richmond*, 924 F.3d 404, 411–14 (7th Cir. 2019) (finding of reasonable suspicion supported in part by gun-like bulge in suspect's pocket and

5

presence in high-crime area, and because "in the officers' over 25 combined years' of police training and experiences, a protrusion like this was more often than not a gun").

Here, Officer Nash perceived an object conspicuously protruding from Dameron's front waist area while watching the POD camera. (Hearing Tr. at 11:2–6; *id.* at 14:5–7). Nash testified credibly that he observed the bulge while viewing the POD camera in the area of 61st and King, something he does on a daily basis. When he first observed the bulge, he zoomed in on the bulge and confirmed in his mind that it was in fact a gun. At the hearing, the prosecutor showed the video footage that Nash observed and the zoomed in footage of the object under Dameron's shirt. The object clearly resembled a gun. The footage is clear, there are no objects blocking the line of site, and there are multiple views of the "L-shaped" object in Dameron's waistband. Dameron also moves as he walks as if he is holding himself in a way that the weapon will remain in its spot in his waistband. Nash testified credibly that he has years of experience as an officer, but more importantly, he has been observing this block in the city daily for over 18 months. He is aware of multiple shootings and narcotics trafficking in the area. He elaborated that he has seen such "L-shaped" objects tucked beneath people's shirts on multiple other occasions before – only later to determine that they were, in fact, handguns. Nash's testimony was credible, supported by the video evidence, and not attacked on cross examination except to suggest that others in the area may be involved in non-criminal activity. Such cross examination does not impact the truth of what he observed based upon his training and experience.

Officer Brogsdale's testimony was similarly credible. He estimated that his police unit has been called to the 6100 block of South Martin Luther King Drive more than one hundred times over the past eight to nine years to respond to shootings, killings, and drug crimes. Brogsdale is aware of ongoing gang violence between two gangs and that is why the Strategic Surveillance

6

team was focused on the block. Brogsdale's testimony was corroborated by his body camera footage. The stop was brief, the pat down was quick, the weapon was retrieved, Dameron was removed from the bus, and Dameron admitted that he was selling weed and used the gun for protection. All of this corroborates Brogsdale's testimony and was not minimized by cross examination. Although an individual's mere "presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. . . . officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124. It was appropriate for the Officers to consider that Dameron's actions were occurring in a "high crime area" as they decided whether to undertake further investigative steps. *Id.* (citing *Adams v. Williams*, 407 U.S. 143, 144, 147–48 (1972)). *See also United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010) (finding reasonable suspicion based in part on suspect's presence "in a location that was known to the officers to be a high-crime area plagued by drug trafficking and gun violence."). Cumulatively, these facts gave rise to reasonable suspicion that Dameron may have had a weapon, *Ruiz*, 785 F.3d at 1141, and therefore justified CPD's *Terry* stop.

"In the course of an authorized investigatory stop, an officer may proceed to conduct a protective pat down when confronting facts and circumstances giving rise to a reasonable suspicion that the individual has a weapon and otherwise poses a danger." *Adair*, 925 F.3d at 937. While an investigatory stop does not automatically entitle law enforcement to conduct a protective pat down, *see id.*, because the frisk in this case occurred simultaneously to the investigatory stop, the reasonable suspicion supporting the stop also supports the frisk. *See, e.g.*, *United States v. Morgan*, No. 19-cr-615, 2021 WL 2186183, at *8 (N.D. Ill. May 28, 2021) ("[G]iven that the criminal

7

activity the officers reasonably suspected was precisely that [the suspect] was 'armed and presently dangerous,' and that the stop and frisk happened at nearly the same time, the validity of each essentially rises and falls together.") (citations omitted); *United States v. Duarte*, No. 19-cr-876, 2021 WL 1906470, at *3 (N.D. Ill. May 12, 2021). At the time Officer Brogsdale "quickly patted down the front of Dameron's waist" while aboard the city bus, (Dkt. 77 at 0:19–:25), he had reasonable suspicion that Dameron might possess a gun based on Officer Nash's POD camera surveillance. The pat down of Dameron's front waist to secure that suspected weapon was "the least intrusive means" to address this safety concern. *Ruiz*, 785 F.3d at 1143 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Thus, Officer Brogsdale had reasonable suspicion to stop and frisk Dameron and seize his firearm. *Terry*, 392 U.S. at 27, 31. Once Officer Brogsdale confirmed that Dameron did not possess a proper permit for carrying that firearm, (Hearing Tr. at 32:2–6), the Officers had probable cause to arrest Dameron. Consequently, the Officers did not violate Dameron's Fourth Amendment rights in the course of this investigatory stop and seizure.

## CONCLUSION

For the foregoing reasons, Dameron's Motion to Suppress [71] is denied.

 _____
 Virginia M. Kendall
 United States District Judge

Date: October 18, 2021